## Schwab Adoption Case.

Argued October 4, 1946.  Before MAXEY, C. J.,
DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Clyde P. Bailey,* with him *Dane Critchfield, Daniel J.
Parent* and *Bailey & Critchfield,* for appellant.

*James P. McArdle, for appellees.*

Opinion by Mr. Justice Allen M. Stearne, January 14, 1947:

This is an appeal from a decree of an orphans' court permitting the adoption of a minor. The pivotal question is whether an abandonment of the child, by its mother, was proven as required by section 2 (c) of the Act of April 4, 1925, P. L. 127, sec. 2, as amended April 26, 1929, P. L. 822, sec. 2, 1 PS, section 2 (c).

In Pennsylvania a valid adoption severs the child from its natural family tree and engrafts it upon that of its new parentage. Thereafter the child attains the status, in law, of a natural child of the adopting parents: *Cave's Estate*, 326 Pa. 358, 192 A. 460. Adoption is a practice which was recognized by the civil law from its earliest date, but was unknown to the common law of England. It exists in the United States solely by virtue of statute. The first statute of adoption in this Commonwealth was the Act of May 4, 1855, P. L. 430: Chief Justice Sharswood in *Ballard v. Ward*, 89 Pa. 358, 362; President Judge Rice in *Evan's Estate*, 47 Pa. Superior Ct. 196, 198. See *Carroll's Estate*, 219 Pa. 440, 68 A. 1038.

The Act of 1855, supra, conferred jurisdiction in adoption upon the common pleas courts: *Ballard v. Ward*, supra. Cf. *Thompson's Adoption*, 290 Pa. 586, 589, 139 A. 737. The Act was subsequently amended by the Act of April 2, 1872, P. L. 31 (later repealed, providing for adoption by deed); by the Act of May 19, 1887, P. L. 125 (later repealed, enlarging sec. 7 of the Act). The Act of May 11, 1923, P. L. 201, sec. 1, 17 PS, section 693, conferred concurrent jurisdiction upon the municipal court in cities of the first class. The Act of 1925, supra, conferred concurrent jurisdiction upon the orphans' court with the courts of common pleas and codified the law and procedure in adoption. The Act of 1925, supra, was amended by the Act of April 26, 1929, P. L. 822 (as to procedure) and finally by the Act of July 2, 1941, P. L. 229, Title 1 PS, sec. 1, 1945 Cumu-

lative Annual Pocket Part. (This Act conferred exclusive jurisdiction upon the orphans' court, except in cities of the first class, where the municipal court was given exclusive jurisdiction).

Where a remedy or method of procedure is provided by an Act, its provisions must be strictly pursued and exclusively applied: *Bartron v. Northampton County,* 342 Pa. 163, 168, 19 A. 2d 263; *Thompson v. Morrison,* 352 Pa. 616, 624, 44 A. 2d 55; *Era Company, Ltd. v. Pittsburgh Consolidation Coal Company,* 355 Pa. 219.

Section 2 (c) of the Act of 1925, supra, provides that the petition for adoption must contain the consent of the parents or surviving parent of the person proposed to be adopted. The Act provides: ". . . *the consent of a parent . . . who has abandoned the child is unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact"* (italics ours). See *Hazuka's Case,* 345 Pa. 432, 29 A. 2d 88.

In the instant case the mother of the child, the surviving parent, refused to give her consent to an adoption by the paternal grandparents. At the hearings she was charged with abandonment. Judge TENER was the hearing judge. He entered an order dismissing the petition. In his opinion, discussing the facts and the law, he found as a fact that abandonment had not been proven to his satisfaction. Judge TENER's tenure of judicial office thereafter expired. He was succeeded by Judge Cox. Exceptions were filed to Judge TENER's decree, which were heard by the court in banc, consisting of President Judge TRIMBLE and Judges BOYLE and Cox. In an opinion by Judge TRIMBLE, with a concurring opinion by Judge Cox, the exceptions were sustained and the adoption permitted. Judge Boyle filed a dissenting opinion.

The legal problem is therefore presented: where the hearing judge, who alone saw and heard the witnesses, finds as a fact that abandonment was not proven

to his satisfaction, may a majority of the court in banc reverse such finding?

The Act, in plain words, prescribes who shall make the finding of fact as to abandonment and in what manner it shall be indicated. The words of the act are clear and free from all ambiguity and therefore must be given effect: *Salvation Army Case*, 349 Pa. 105, 36 A. 2d 479.

The finding of a hearing judge as to abandonment, under the act, is nevertheless reviewable. Such a finding may not be made arbitrarily. There must be evidence legally sufficient to support it: *Davies Adoption Case*, 353 Pa. 579, 46 A. 2d 252.

The finding in this case cannot be regarded as arbitrary when after exhaustive hearings two judges were of opinion that no abandonment was proven, while two other judges were of the contrary view. It comes then to a review of the evidence to determine whether it is legally sufficient to support the finding. If the finding is properly supported, it is immaterial that another judge, or judges, under the same evidence, might have reached another and different conclusion: *Frank's Estate*, 339 Pa. 499, 15 A. 2d 353; *Lochinger v. Hanlon*, 348 Pa. 29, 33 A. 2d 1; *Kenna Estate*, 348 Pa. 214, 34 A. 2d 617.

This Court has defined abandonment. It imports any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquishes all parental claim to the child: *Weinbach's Appeal*, 316 Pa. 333, 175 A. 500. The question, therefore, is whether the mother, by her conduct, evidenced such intention to abandon her child and to forego all parental duties and to relinquish all parental claim. Our review of the testimony convinces us that the finding of the hearing judge is amply supported by the testimony.

The parents of the minor were married December 31, 1937. The wife was then but seventeen years of age.

Her husband was nine years her senior. Their child was born October 29, 1938. The parents separated about April 17, 1942. Judge TENER characterized the the domestic relations during this period as "tawdry"—really an understatement of the proven facts. After the marriage the husband exhibited not the slightest effort to perform his marital obligations. He failed adequately to support and maintain his family; he drank to excess; he was profane and abusive, worked irregularly, and was on public relief. The wife also failed in her duties. She not only neglected the home, but failed properly to care for the bodily needs and training of her child. It is quite understandable why the paternal grandparents were hostile and antagonistic toward her.

Upon the separation the wife went to the home of a friend. *She took the child with her.* She returned to the home the next day, and found her husband there. While the hearing judge found that the husband *"without his wife's consent"* took the child to his parents' home (petitioners'), we agree with the statement in Judge BOYLE'S dissent that such taking was in truth a *"forcible"* one. The mother testified that the reason for her failure to attempt to regain the custody of the child was her poverty; her husband did not support her; she was required to earn her own living and had no one with whom to leave the child and that she realized that the child would receive proper care in the grandparents' home.

Petitioners contend that after the child came into their custody, the conduct of the mother evidenced the intent of abandonement. They point to the fact that the mother only visited the child three times from the time they assumed custody of the child in April, 1942, until the petition for adoption was filed in November, 1943, a period of about a year and one half. In answer to this charge the mother testified that petitioners being hostile to her, obstructed her repeated efforts to visit and talk with the child; that on one occasion, by ruse, she was able to enter petitioners' home and see and talk with the

child, but such interview was unsatisfactory because of one of petitioners' conduct. All of this was denied by petitioners. The mother also testified that her husband on many occasions surreptitiously took her child out of the petitioners' home to a public park, where she met and talked with the child and they were taken by the husband to a refreshment stand.

Petitioners also said that the mother neglected to contribute toward the child's support. We note from the record that the child has remained in the custody of petitioners since April 17, 1942. The father died in September, 1943. The petition for adoption was filed November 12, 1943—within two months after his death. While the father lived it was his obligation to support the child and not that of the wife. After the separation the husband made no contribution toward her support. To maintain herself the wife worked as a domestic, as a night chambermaid at a city hotel, as clerk in a store, and in war work. Her minimum wage was $3.50 per week and board, and the maximum $38 per week, which was barely sufficient for her own sustenance. Since the filing of the adoption petition on November 12, 1943, and pending this litigation, it would seem to be no dereliction of duty not to pay or offer to pay for the support of the child.

It should be noted that the majority of the learned court in banc, in reviewing and reversing the hearing judge's findings, gave considerable attention to the desirability of the proposed adoption. They concluded that the proposed adoption was beneficial to the child. Consideration of what is beneficial for the child is vital in custody cases, but cannot be regarded as evidence of abandonment. The child's happiness and well being is the paramount consideration in *custody cases: Commonwealth ex rel. v. Daven,* 298 Pa. 416, 148 A. 524. Under the *Adoption Act* the welfare of the child is weighed only

*after* the necessary consents have already been given or forfeited.

The welfare of the child, as an element in adoption proceedings, has no relation to the question of the parent's abandonment. In *custody* cases the orphans' court has no jurisdiction. Ordinarily this question is brought before the common pleas under the 13th section of the *Habeas Corpus* Act of February 18, 1785, 2 Sm. L. 275, sec. 1 (12 PS, 1871). See *The Commonwealth v. Addicks,* 5 Binney 519. In Philadelphia County the Municipal Court has been given *exclusive* jurisdiction: Act of July 12, 1913, P. L. 711, sec. 11 (a) ; Act of June 17, 1915, P. L. 1017, sec. 1; Act of July 17, 1917, P. L. 1015, sec. 1. In Allegheny County, the county court has jurisdiction in juvenile custody cases, where it has already acquired jurisdiction in matters relating to the child's maintenance. Acts of March 19, 1915, P. L. 5, sec. 1; May 23, 1923, P. L. 324, sec. 1 (17 PS, 653).

*Petition of Sulewski et al.,* 113 Pa. Superior Ct. 301, 173 A. 747, cited by Judge BOYLE in his dissent, has particular application to the present case. The appeals in that case were from Northumberland County where there is no separate orphans' court. The same judges sit in both courts. One appeal was from the orphans' court decreeing an adoption where consent was withheld and no finding as to abandonment. The other appeal was from a decree of the common pleas in a *habeas corpus* case for the custody of the child sought to be adopted. The court below refused custody to the mother and left the child with the petitioners for adoption. The Superior Court, in an exhaustive opinion by Judge KELLER (later President Judge) reversed the appeal as to adoption and dismissed the petition, but affirmed the judgment as to custody. As the cases were heard together by the same judge, who would have heard both of them if tried separately, the Superior Court refused to reverse on a question of procedure (p. 311). Judge KELLER

said, p. 308: "Unless the requisite consents declared by the act of assembly to be necessary are obtained, or there is a specific finding that both the father and the mother of the children have abandoned them, a decree of adoption cannot be entered. The welfare of the children is not sufficient ground for the decree of adoption, unless based on the necessary consent of the parents, or on the distinct finding that the parent or parents not consenting have abandoned the children. The fact that the adoption asked for may be advantageous to the children and for their material welfare, is not to be considered by the court until the necessary prerequisites for such action exist."

We are therefore required to reverse the decree here appealed from, but expressly withhold any decision as to the custody of the child, a matter not now before us.

The decree is reversed. Costs to be paid by appellee.

———

Dissenting Opinion by Mr. Chief Justice Maxey:

I dissent from the majority opinion. The court below decided that the mother had abandoned her child when it was 3½ years of age and our duty is "to examine the testimony to determine whether there is any evidence to sustain the finding of fact" as this court said in *Weinbach's Appeal*, 316 Pa. 333, 337, 175 A. 500, which rule was followed by Mr. Justice Jones in *Davies Adoption Case*, 353 Pa. 579, 46 A. (2d) 252.

I agree with the majority opinion that abandonment "imports any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquishes all parental claim to the child: *Weinbach's Appeal*," supra. I think the evidence in this case fully supports the charge of abandonment as thus defined. I do not agree with the statement in Judge Boyle's dissent (which statement is accepted in the majority opinion) that the father's taking of this child from the mother "was a forcible one," if it is meant

thereby that the father used unlawful force to take this child away from its mother. The mother testified that it was she who left her husband on April 17, 1942. She said when she started out on the 17th with the baby and the baby's clothes, she found the husband was already home from work. She said: "I made a mistake. I was young, I guess; I didn't know any different, right from wrong. I says to him, 'Well, Gus, so long. You won't be seeing me nor the baby either.' So he said, 'Oh, yes,' and he grabbed the clothes and pushed them back and grabbed the kid with the other hand, went down Werner Street towards Gironde, and turned to the left, and where he went to I couldn't say, because he went fast." She was then asked what she did. She said: "I figured that if I would stay around the house—he knew if I make my mind up it was made up, and if I would stay around the house that he would not come back with the baby, he would take it up to his mother's and therefore I would not have no way of getting it." She then said she took a street car and went to the home of Mrs. Bessie Grande, 2206 Perrysville Ave. She stayed there and did housework for a while. She made absolutely no effort to regain possession of her child. Since it was she who left the home, the father was legally justified in taking the child as he did when he discovered that the mother was leaving him (her husband) and without his consent taking the child away from their common habitation. Almost any other father who was concerned for the welfare of his child would do what this father did in taking the child away from the mother who had grossly neglected it, and in placing the child with the paternal grandparents who, it is not disputed, have taken excellent care of this child and who now, after several years good care of the child, want to adopt the boy as their own. After the husband took this child from the wife who was leaving him and their home, the mother of the child made absolutely no effort either by

legal proceedings, or otherwise, to regain possession of the child, and from April 17, 1942 until January 1944 while the mother resided in the same section of the city of Pittsburgh as this child resided with his paternal grandparents, she never talked to the child on the telephone and made only one attempt to visit him. After these adoption proceedings were instituted she made two visits to the child. After April 17, 1942, the only gifts which she sent to the child were $1 at Christmas time in 1943 and three handkerchiefs and three chocolate bars at about Easter time 1944. Except for a brief period immediately following her separation from her husband she was employed as a cashier in a chain store and as a defense worker both in Pittsburgh and Detroit, Michigan, and her earnings ranged from $90 to $140 a month. She never contributed any of her income, except $1, to the welfare of the child. Mrs. Shaughnessy, who occupied the second story of the building in which this child's parents resided in Pittsburgh, testified that the child was neglected by its parents and was not properly bathed and nourished, and that when the child had measles the mother was "out on the street jumping rope and playing ball with school children." She said the child was getting "sore eyes" and was "broken out with a rash", and that it was upon her advice that the father of the child took him to the paternal grandparents. Other neighbors corroborated this testimony. Miss Ruth Zimmerman, who was an investigator for the Western Pennsylvania Humane Society, testified that many complaints had been received about the neglect of this child by its parents. Upon investigating she found "terrible conditions" in the home. The child was very dirty, and was undernourished. At one time a complaint had been filed with an Alderman by the child's father against the mother, charging abandonment. This court in an opinion by Mr. Justice STERN in the *Hazuka's Case*, 345 Pa. 432, 435 said: "Abandonment may occur in a

number of ways. It may be effected by a formal legal instrument or merely by conduct evincing a settled purpose to forego all parental duties and relinquish all parental claims. It is a matter largely of intention to be ascertained from the circumstances, and whether or not a child has been abandoned is a question of fact."

The court was fully justified in making on the evidence the finding that this child had been abandoned by his mother. In affirming the action of the court below we have not overlooked the testimony of the child's mother to the effect that in the summer of 1942 when she went to visit her child either "Mr. or Mrs. Schwab" (she does not remember which one) "pulled the child back when they seen me coming and slammed the door". This testimony was denied by Mr. Schwab. When the mother was asked if she made any effort at any other time to see the child she replied: "I was afraid to go down on account of I knew that if they thought I was coming around they would not open the door and let me in." Even on her own testimony she made but few and feeble efforts to visit her child. She stated that at Christmas 1943 she was admitted to the grandparents' home and saw the child. She remained there about fifteen minutes. Clearly the weight of the testimony is that the mother of this child had ceased to feel such concern for its interest as a mother naturally has for her child. Her conduct evinced a purpose to disregard her maternal duties and relinquish her claim to her child's custody and companionship.

To "abandon" a child does not necessarily mean that the abandoning parent makes a formal declaration of abandonment or ignores entirely the child's existence and evinces no interest whatsoever in its whereabouts and welfare. It means that the parent has acquiesced in a termination of that close relationship which normally exists between a parent and child and in the assumption by others of complete parental rights and responsibilities

in respect to the child. The long continued conduct of this boy's mother revealed an intention on her part toward him which is the negation of an intention to support him, to promote his well-being and to retain a maternal relationship with him. If no one did more for this child than its mother did the child would have died of neglect. Apparently this mother was satisfied to have her son's paternal grandparents support and foster him without assistance from her and to enjoy his exclusive custody and companionship, with all the reciprocal responsibilities incident thereto. She shared none of her substantial earnings with the child. What we wish to retain and maintain we do not thus "abandon" and give up to someone else for safe-keeping.* What we are indifferent to we lose. This mother who earned from $90 to $140 a month over a considerable period of time showed unmaternal indifference toward her child and she cannot justify that indifference by a plea of poverty. Out of $38 a week, her admitted earnings at certain periods, she should certainly have contributed more than $1 at Christmastime in 1943 and 3 handkerchiefs and 3 chocolate bars at Eastertime in 1944, to the support of her child.

I agree, of course, with the excerpt from the opinion of Judge KELLER in *Petition of Sulewski et al.,* 113 Pa. Superior Ct. 301, 173 A. 747, which the majority opinion quotes, to wit: "The welfare of the children is not sufficient ground for the decree of adoption, unless based on the necessary consent of the parents, or on the distinct finding that the parent or parents not consenting have abandoned the children." But in this case there was a distinct finding by the court below that the sur-

---

* "Abandonment denotes the absolute giving up of an object, often with the further implication of its surrender to the mercy of something or someone else": Webster's New International Dictionary, Second Edition.

viving parent (the mother) abandoned her child, and this finding was, in my judgment, amply supported by the evidence. Such being the state of the record, the future welfare of the child becomes a proper matter for consideration. On that question also we agree with the court below.

In *Weinbach's Appeal*, supra, this court quoted with approval what was said in *Winans* v. *Luppie*, 47 N. J. Eq. 302, 304, 20 Atl. 969, 970, as follows: "The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties, than does the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned."

This New Jersey case and a part of the opinion filed in that case were also cited by this court in *Hazuka's Case*, 345 Pa. 432.

This boy, who was eight years of age on the 29th of October last, has been with his paternal grandparents since he was 3½ years of age. Strong ties of affection are formed between a child and those who treat him kindly, train him properly and minister to his welfare. The proof is that these paternal grandparents have given this boy loving care. They have a comfortable unmortgaged home, the assessed valuation of which is $4500. Their annual income is $3000. The boy is being educated and the reports as to his progress in school are satisfactory. The grandparents testified that the child is happy in his present surroundings and that he wishes to remain with them. The grandmother testified that the child was in an ill-kept condition when he came to them and that he was a "scared" child. He was thin and pale and "had to be coaxed to get him to play". He is now a normal child in every respect and is in good health. He resides in the only home he has known since he emerged from infancy. This home is in the city of his birth and upbringing. His mother, whom he has seen but a few times since he was 3½ years of age, and who neglected him when he resided with her and who contributed only $1 toward his support in four years, is now married to a man who is a total stranger to this boy and her home with this husband is in a distant state. To take this eight year old boy out of the grandparental home to which he has long been accustomed and place him in a home presided over by his stepfather in Muskegon, Michigan, would be likely to cause a serious emotional disturbance in him and would be detrimental to his health, his happiness and his general well-being.

In *Davies Adoption Case*, 353 Pa. 579, this court in an opinion by Mr. Justice JONES said: "The emotional disturbance to a child that would threaten from its being removed summarily and permanently from familiar and agreeable surroundings and associations, incident to the only parental control and supervision it has ever known,

could have a very harmful effect on the child's whole life. Fortunately, the law's regard for a child's welfare does not admit of any such injury or harm being done it . . . the child's welfare [is] not to be subject to the precariousness of a later asserted change of mind on the mother's part . . ."

The majority opinion poses this question: where the hearing judge, who alone saw and heard the witnesses, finds as a fact that abandonment was not proven to his satisfaction, may a majority of the court en banc reverse such finding? My answer to that is *yes*. The majority opinion admits that "the finding of a hearing judge as to abandonment, under the Act, is nevertheless reviewable" but the implication of the majority opinion appears to be that the findings of one hearing judge is entitled to more weight than the findings of the court en banc. I do not think that the Act of Apr. 4, 1925, P. L. 127, as amended on Apr. 26, 1929, P. L. 822, 1 PS, section 2(c), intended by the phrase "prove to the satisfaction of the court or judge hearing the petition" that if only one judge listened to the witnesses he was the only part of the court to be "satisfied" in order to decide the case. The words "court or judge" obviously mean the tribunal to which the petition was addressed and which acted on the petition after the evidence was all in. The word "hearing" is used in the sense of adjudicating or acting on.

Mr. Justice MOSCHZISKER in his opinion in *The Lewisburg Bridge Co., Aplnt., v. The County of Union and The County of Northumberland,* 232 Pa. 255 said, speaking for this court: "The word 'hearing' means 'the session of any court, or of an adjunct thereof, for considering the proofs in a case': Anderson's Law Dictionary, 506; 'The receiving of facts and arguments thereon for the sake of deciding correctly:' 4 Words & Phrases, 3237."

In *Menard v. Bowman Dairy Co.,* 15 N.E. (2d) 1014, 1015, 296 Ill. App. 323, the court held, " 'Hearing' is

frequently used in a broader and more popular significance to describe whatever takes place before magistrates clothed with judicial functions and sitting without jury at any stage of the proceedings subsequent to its inception, and may include proceedings before an auditor." See also *Commonwealth v. Seventeen Half Barrels of Beer*, 94 Pa. Superior Ct. 430.

Judge TENER, who made the first finding of facts in this case, retired from the bench before the case was heard by the court en banc. We have no right to conclusively assume that Judge TENER would not have agreed with the majority of the court as to the abandonment of this child, after he had considered the evidence further and had an opportunity to receive and to consider the views of his colleagues. It not infrequently happens that the judge who takes the testimony and makes preliminary findings of fact, later joins with one or more of the court en banc in sustaining exceptions to the original findings. In the instant case there was no such substantial contradiction between the testimony of the witnesses as to give the conclusion of the judge who listened to the witnesses any better facilities for passing on the facts of this case than was given to the court en banc which reviewed the entire transcript of the testimony.

It is clear that it is to the best interest of this eight year old boy that he remain with his paternal grandparents where he has been well-cared for, where he is contented and where he is making satisfactory progress in his school work. Since the custody of the grandparents should not be disturbed, no good purpose is served by refusing the request of the grandparents to adopt this child. Inasmuch as the court below found upon sufficient evidence that the mother of this boy abandoned him and that the boy's interests would be promoted by the adoption asked for I would affirm its order.