Hangartner Adoption Case.

Argued April 25, 1962. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Frank W. Jenkins,* for appellant.

*Joseph A. C. Girone,* with him *Mead S. Spurio,* for
appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May
21, 1962:

On this appeal from a decree of adoption entered by
the County Court of Philadelphia the sole issue is the
sufficiency of the evidence on this record to support
the finding by the court below that the natural father
of the child abandoned the child.

The seven and one-half year old child sought to be
adopted is Kathleen R. Hangartner. Her natural par-
ents are Margaret C. Hangartner, now Margaret C.
White,* who not only consents to the adoption but is
one of the petitioners for the adoption, and Jimmie G.
Hangartner, who opposes the adoption. The Hangart-
ners were married in Texas on November 22, 1953. Pri-
or to that marriage, Mrs. Hangartner had been married
to one Frank R. Germana and that marriage was dis-

---

* To avoid confusion we refer throughout this opinion to the
natural mother of the child as Mrs. Hangartner although since
May 29, 1959 she is actually Mrs. White.

solved by a divorce granted on September 2, 1952 in Nueces County, Texas.

Hangartners lived together at several places: (a) in Austin, Texas, from the time of their marriage until October, 1954; (b) in Roanoke, Illinois (the home of Mr. Hangartner's parents), from October, 1954 until February, 1955; (c) in a trailer court at Urbana, Illinois (where Mr. Hangartner attended the University of Illinois), from February, 1955 until April, 1957. In *April, 1957*, Mrs. Hangartner, taking with her the child, left the matrimonial domicile and established a separate residence in Champaign, Illinois, a city in close proximity to Urbana. In February, 1958, Mrs. Hangartner and the child moved to Pennsylvania where for varying periods of time they lived at, at least, four different addresses in the Philadelphia area.

At the wife's instance, Hangartner's marriage was dissolved by a divorce granted by the Court of Common Pleas of Philadelphia County on May 26, 1959. Three days later—May 29, 1959—Mrs. Hangartner married R. W. White, one of the petitioners for the adoption of this child. With the exception of several months in Alabama, the Whites have lived continuously since the date of their marriage in the Philadelphia area and with them has lived the child Kathleen.[1]

On April 12, 1961 Whites petitioned the County Court of Philadelphia County for the adoption of Kathleen R. Hangartner. After hearings at which Mr. Hangartner appeared and opposed the adoption, the court found that Mr. Hangartner had abandoned the child since *April, 1957* and entered a decree permitting the adoption of the child by Whites.[2] From that decree this appeal was taken.

---

[1] In their household there is an infant son born to the Whites.

[2] The actual finding was as follows: "That, Adoptee, Kathleen Rose Hangartner, was abandoned by her father, Jimmie Glenn Hangartner, in *April, 1957*, and that said abandonment had continued

In our approach to this problem we bear in mind that which Chief Justice STERN stated in *Harvey Adoption Case,* 375 Pa. 1, 3, 4, 99 A. 2d 276: "Proceedings for the adoption of a child must be carefully differentiated from those involving merely a question of its custody; they are of far greater importance and involve more serious consequences. Custody may be awarded for a more or less temporary duration, but a decree of adoption terminates forever all relations between the child and its natural parents, severs it entirely from its own family tree and engrafts it upon that of its new parentage: Schwab Adoption Case, 355 Pa. 534, 536, 50 A. 2d 504, 505. For all purposes, legal and practical, the child thenceforth is dead to the [parent] . . .; [the parent] has lost the right ever to see [his or her] child again or even to know of its whereabouts. Because, therefore, of these direful results of an adverse adoption proceeding the rights of the natural parent should not be terminated unless the record *clearly* warrants such a decree: Southard Adoption Case, 358 Pa. 386, 392, 57 A. 2d 904, 907". (Emphasis supplied.)

Abandonment is clearly defined by the adoption statute (Act of April 4, 1925, P. L. 127, §1, as amended, 1 PS §1) as "conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties". See also: *Schwab Adoption Case,* 355 Pa. 534, 538, 50 A. 2d 504; *Southard Adoption Case,* 358 Pa. 386, 391, 57 A. 2d 904; *Harvey Adoption Case,* supra, p. 6; *Maisels Adoption Case,* 395 Pa. 329, 332, 149 A. 2d 38. While failure on the part of a parent to support a child is a factor to be considered in determining whether the parent has abandoned the child, yet

---

for a period of more than six months; namely, from *April 1957* to this date." (Emphasis supplied.)

failure to support, standing alone, is not conclusive of an intent to abandon the child: *Southard Adoption Case,* supra, pp. 391, 392.

A review of this record clearly indicates that, until April, 1957, the child lived with both natural parents at which time the mother and child established a new and separate residence in Champaign, Illinois. Mr. Hangartner was not informed of the address of this new residence and, only after he had followed Mrs. Hangartner's car, did he learn where the child was residing. Some time later, Mrs. Hangartner established another residence in the same city again without informing Mr. Hangartner of the address and, only after he had contacted a babysitter, did he learn the new address. After the father on each occasion learned the whereabouts of the child, *at his insistence,* he visited the child at least once every two weeks,[3] took the child to lunch and occasionally took the child for visits to her paternal grandparents' home in Roanoke, Illinois. It is also clear that during this period the child was financially supported by Mrs., not Mr., Hangartner.

In February, 1958, *without any notice to her husband and without giving any address where the child could be located,* Mrs. Hangartner left Illinois and established residence in the Philadelphia area, Pennsylvania.[4] Not only did she conceal her new residence from Mr. Hangartner but even from her own parents who, according to Mrs. Hangartner's own testimony, were informed only that her new residence was "somewhere in the east". In Pennsylvania, Mrs. Hangartner and the child lived at various addresses in the Philadel-

---

[3] The natural father testified that these visits took place weekly. The natural mother testified these visits took place every two weeks. For the purpose of this appeal, we accept the testimony of the mother in this respect.

[4] It is obvious that this choice of residence was dictated by the fact that White's residence was in the Philadelphia area.

phia area and it was not until Mrs. Hangartner instituted divorce proceedings in Philadelphia County that Mr. Hangartner was given any inkling of the whereabouts of the child. At that time Mrs. Hangartner gave as her residence, in Philadelphia County, 7509 Torresdale Avenue, Philadelphia, *a place of residence she occupied for only four days.*

In the meantime, Mr. Hangartner had contacted the parents of Mrs. Hangartner in Texas and was unable to secure from them any information as to the whereabouts of the child. He sent a money order for $75 and a letter addressed to Mrs. Hangartner, General Delivery, Champaign, Illinois, and the money order and letter were returned to him, having been refused by Mrs. Hangartner. Mr. Hangartner, prior to the institution of the divorce action, had received a letter from Mrs. Hangartner instructing him to send her furniture to the residence of a Mr. and Mrs. Chipman, Champaign, Illinois, which instruction was carried out. *This letter was postmarked Champaign, Illinois, although at the time Mrs. Hangartner was a Pennsylvania resident.*[5] When, in connection with the divorce proceedings, Mr. Hangartner learned of the Torresdale Avenue address. he sent a letter to that address and that letter was returned to him. Mr. Hangartner tried to locate the whereabouts of the child by inquiry of Dr. Vestling, by whom Mrs. Hangartner had been employed, and Dr. Vestling stated he did not know the address of Mrs. Hangartner[6] and did not want to become involved in the matter.

Mrs. Hangartner took the position that her husband could have learned her whereabouts not only by in--

---

[5] It is obvious that, in an attempt to conceal her residence in Pennsylvania, Mrs. Hangartner had forwarded this letter to Champaign to be sent to Mr. Hangartner.

[6] Dr. Vestling, in answer to interrogatories, stated he did not know Mrs. Hangartner's address.

quiry of Dr. Vestling, but also of an Attorney Appleman, of a Dr. Bonnett and several persons who were White's fraternity brothers when he was a student at the university. Attorney Appleman, in answer to interrogatories, stated he knew Mrs. Hangartner only through telephone calls to him, that he knew only such address as given to him in connection with these phone calls and did not know Mr. Hangartner at all. Dr. Bonnett, in answer to interrogatories, denied he knew Mrs. Hangartner's address. The several fraternity brothers of White Mr. Hangartner had met only once at a dinner.

A careful scrutiny of this record reveals a studied and settled plan on the part of Mrs. Hangartner to conceal and hide from Mr. Hangartner any knowledge as to the whereabouts of the child. The avenues to ascertain such whereabouts, as suggested by Mrs. Hangartner, were not open to this child's father. It is generally true that "knowledge of the whereabouts of the child is essential to proof of persistence [on the part of the parent] in an abandonment for six months": *Ashton Adoption Case,* 374 Pa. 185, 199, 97 A. 2d 368. Unless a parent knows or has means of knowing where his child is, how can it be found that he either refused or failed to perform parental duties?

The mere fact that the father of this child failed to give support to the child is not per se grounds for decreeing an abandonment under the facts presented in the case at bar.[7]

---

[7] In this connection it is to be noted that on the one occasion when a $75 money order was sent it was returned and spurned, that the father maintained a bank account of approximately $200 for the child, that the child was named in several life insurance policies as a contingent beneficiary and that during the period from April, 1957 to February, 1958 the father was a student at the university on government aid while the mother was working.

The court below set the date of abandonment as *April, 1957* and this date is irreconcilable with the evidence of record. Between April, 1957 and February, 1958 the father of this child saw it at least every two weeks, took the child with him, visited the paternal grandparents' home and, if the father's testimony is to be believed, purchased at least one dress and toys for the child.

Under the evidence on this record there was not sufficient proof of conduct on the part of Mr. Hangartner to evidence "a settled purpose of relinquishing [his] parental claim to the child and of refusing or failing to perform parental duties". Absent such proof together with presence of clear proof of deliberate concealment on the part of Mrs. Hangartner of the whereabouts of this child, the court below erred in finding an abandonment of this child.

It is evident from reading the opinion of the court below that its determination was based mainly on two reasons, i.e., failure on the part of the parent to support and the best welfare of the child. As to the first reason, as we have stated above, failure to support standing alone does not under the instant factual situation justify a finding of abandonment. As to the second reason, the welfare of the child is *not* to be considered until abandonment has been established or consent proved: *Susko Adoption Case,* 363 Pa. 78, 69 A. 2d 132; *Schwab Adoption Case,* 355 Pa. 534, 50 A. 2d 504. In *Susko,* supra (pp. 81, 82) we stated: "Unlike custody cases, in adoption proceedings the welfare of the child is not material until either consent or abandonment as prescribed by the Adoption Act has been established". In *Schwab,* supra (p. 541), we said: "The welfare of the child, as an element in adoption proceedings, has no relation to the question of the parent's abandonment." In *Ashton,* supra, we approved the language of this Court in *Schwab,* supra (p. 200): "Considera-

tion of what is beneficial for the child is vital in custody cases, but cannot be regarded as evidence of abandonment".

The finding of abandonment by the court below is not justified by the evidence of record. Under such circumstances the decree of adoption cannot stand. This result is reached with reluctance because it may well be, as the court below found, that the best interests of the child would be promoted by this adoption. However, we are bound to follow the legislative mandate enunciated in the adoption statute and we cannot sever the ties between a father and his child unless the quantum of proof required by that statute is satisfied.

Decree reversed. Each party to pay own costs.