**IN THE MATTER OF THE ADOPTION OF THE INFANT LANCE DRESDNER BLUMENTHAL BY HEINZ P. SCHENKER**

**HARVEY J. BLUMENTHAL, Appellant**

No. 14,904

United States Court of Appeals

Third Circuit

Argued January 25, 1965

Decided June 9, 1965

*See, also, 346 F.2d 783*

WILLIAM W. BAILEY (BAILEY & WOOD), Charlotte Amalie, St. Thomas, Virgin Islands, *for appellant*

WILLIAM H. D. COX (COX & BORNN), St. Thomas, Virgin Islands, *for appellee*

Before MARIS, McLAUGHLIN and FREEDMAN, *Circuit Judges*

McLAUGHLIN, *Circuit Judge*

In this adoption proceeding the petitioner is Heinz P. Schenker. The infant sought to be adopted is Lance D. Blumenthal, a male child, ten years old when the petition was filed. He is the son of Harvey J. Blumenthal and the present Mrs. Schenker who obtained a divorce from her husband, Mr. Blumenthal, on May 12, 1958. All of those people are residents of the Virgin Islands. The petition was filed under Title 16, Chap. 5, Section 141 et seq. of the Virgin Islands Code. It is of necessity allegedly based on Section 142 (b) of the same Title of the Code. This reads:

"(b) If either parent is insane or imprisoned in a penitentiary under sentence for a term not less than two years, or has wilfully deserted and neglected to provide proper care and maintenance for the child for one year next preceeding the time of filing the petition, or is an unfit person to have the care and custody of the child, the court may proceed as if such parent was dead, and, in its discretion, may appoint some suitable person to act in the proceeding as guardian ad litem of the child and give or withhold the consent required by subsection (a) of this section. In all cases, however, notice to the parent not laboring under such disabilities of insanity or imprisonment mentioned in this subsection, shall be required."

The only language of the petition urged as presenting a cause of action here is paragraph 7 thereof which states:

"7. The said, HARVEY J. BLUMENTHAL, father of the said LANCE D. BLUMENTHAL has neglected to provide proper care and for maintenance for the said child since the divorce, and all payments for the maintenance, care and education of the said infant, LANCE D. BLUMENTHAL, have been made by his mother, HELENE P. SCHENKER."

The answer to the petition which is titled "Objection of Parent to Adoption" is short and we quote it in full:

"Comes Now, HARVEY J. BLUMENTHAL, by his attorneys, Bailey and Wood, Esqs., and respectfully shows to the Court:

233

"1. That he is the parent of the infant, LANCE DRESDNER BLUMENTHAL;

"2. That he does not consent, and has not consented, in writing or otherwise, to the adoption prayed for in the Petition filed February 21, 1963;

"3. That he is a parent not laboring under a disability of insanity or imprisonment;

"4. That he has not neglected to provide proper care and maintenance for the said child since he and the child's mother were divorced;

"5. That he has not wilfully deserted and neglected to provide proper care and maintenance for the child for one year next preceding the filing of the said Petition, and is not an unfit person to have the care and custody of the child.

"WHEREFORE, he prays this Court for an order dismissing the Petition herein."

The facts are clear from the record. Mrs Blumenthal was the plaintiff in the 1958 divorce. The husband filed a formal answer, did not appear in person and consented to an ex parte hearing. The district court commissioner made findings of fact and conclusions of law from the evidence. The sitting judge reviewed and approved these and granted a divorce. In the decree, dated May 12, 1958, it was ordered that Mrs. Blumenthal "continue to have custody of the child Lance Dresdner Blumenthal." With reference to support the court said:

"The plaintiff having made no demand for support, either for herself or for the child, due to the present financial circumstances of the defendant, the said question hereby is reserved for future determination by this Court."

There have been no other or further proceedings whatsoever in the divorce suit.

Petitioner's evidence was directed to the year immediately prior to the filing of the petition. It should be stressed in this connection that the above quoted statute reads: "If either parent * * * has willfully *deserted and neglected* to provide proper care and maintenance for the child for one

234

year next preceding the time of the filing the petition * * *." (Emphasis supplied.) During that year Mrs. Schenker said she received three checks of five dollars each which she returned to Mr. Blumenthal September 26, 1962 with a letter. The letter reads:

"Dear Harvey:

I am herewith enclosing your checks for the sum of $15.00. I do not consider this ridiculously meager amount in any way shape or form, support of a child, for a period of almost nine months.

I shall be delighted to discuss a proper and adequate amount for support if you so desire to call at your convenience.

Very truly yours,
/s/ HELENE P. SCHENKER
Helene P. Schenker"

The witness said that Mr. Blumenthal telephoned her about a month after the date of her letter. She stated that, "He would like to discuss this at some time and could he come out then and I said no, we had an appointment that evening but to call me and I would be glad to another time. That was it." According to the witness, Mr. Blumenthal came to see his son four or five times that year. She said that "He would call and ask for Lance. Lance would talk to him and at this particular point Lance did not care to see him. He would try to make excuses but occasionally he would be so badgered he would make an appointment with his father and then he would try not to keep it unless he was forced to. There were times when he did call and make an appointment for, say two days later. Lance would wait for him and he wouldn't show up at all." On her cross-examination appears the below question and answer:

"Q. Well now, isn't it true that Mr. Blumenthal regularly sent you a check through the mail for the boy and you collected nineteen of them and sent them back to him?

A. Yes, but I take issue with the wording regularly. They have never been regular and the nineteen checks that were sent back covered a period of six months. Which is about $15 a month, and

235

under no circumstances do I personally consider this support for a child. This doesn't even pay for the milk the boy drinks."

Immediately after the above the witness was asked the entirely proper and important question:

"Q. But you never made any attempt to have the decree amended for anything different from the support that was provided in the decree of May of '63?"

That was objected to as immaterial and the objection was sustained on that ground.

Finally, she was asked and answered as shown below:

"Q. Well, you didn't make it easy and pleasant for Mr Blumenthal to come and see the boy when he called up; did you?

A. In the past two years Lance has been extremely reluctant. He has made excuses over the telephone when Mr. Blumenthal has called. He has begged me not to force him to talk to him and after my husband and I were married, we forced this child to see his father. We did not want this relationship that exists now. We did not want to force this situation. This is all Mr. Blumenthal's doing, I feel. He was never discouraged from seeing his natural father. This is a point I want to make clear.

Q. That's your side of the story?

A. That's quite correct.

MR. BAILEY: That's all."

Mr. Blumenthal said that in the 1962–1963 year "I attempted to see my boy, Lance, many times." That answer was specifically objected to on the ground that "Your Honor, this has nothing to do with whether or not he provided proper support."

Asked by the judge to explain what he meant by "I attempted to see him" the following appears in the trial transcript:

"I called to make an arrangement to have an appointment with Lance when I was off from work either on Sunday or Saturday lunch hour which, on many occasions, I have a two hour lunch period.

Q. What would happen?

A. On most occasion he was busy all day Sunday and on rare occasions was I able to have a lunch with Lance and spend—an hour or an hour and half or two hours that I was permitted for lunch with Lance.

Q. To whom did you talk regarding this?

A. I talked with Lance and Lance said he was busy on Sunday. Of course, on many occasions he had to find out if he would be busy Sunday. He wouldn's say yes or no. He would have to ask somebody whether he would be busy. On occasions when he wasn't busy, which were rare, I would take him out and play golf and baseball. On one occasion he said he had a cold and he didn't want to go to the water but when we got to Bluebeard's he wanted to go for a swim and I said 'You have a cold'. 'I didn't tell you the truth,' he said. If he did have a cold and your mother told you not to go in the water it would be very foolish for you and myself to go for a swim. That was one of the rare occasions when I did see him on a Sunday. On the other times that I recall we spent one day when my father was here. My father was here three weeks and one day we saw Lance and I called many times to try and see him."

The witness told about depositing $50 to the account for Lance covering the checks returned to him, and $100 the next month. He said, "When these checks were returned to me the other day, I deposited another hundred dollars. It's right here." He said "At work I take out a bond with my name or Lance as able to cash that bond because it has his name and mine on it * * *." Asked if he had ever been allowed to have his son over night, he replied he had Lance over night only once in the past two years. According to him, and it is not denied, the one time Mrs. Schenker asked him for money for the boy's schooling, he borrowed $500 from his father and gave it to her. Queried as to whether he had ever refused to give any money that Mrs. Schenker had asked for the boy, he replied, "No, I've never refused to give money to Mrs. Schenker." He also said he had given and tried to give clothes to the boy. He had some trouble in that connection. He told how the boy "* * * was very nice about giving the maid's son one or two of these shirts that

237

I gave him without him using them." According to his testimony, between the boy and the mother he has had real difficulty in arranging to see the former.

Under the caption "Findings of Fact" and preceding those Findings is a paragraph reading:

"The report of the Welfare Department of the Virgin Islands Government, which is a confidential report, had been submitted by the Welfare Department to the Judge of the Court, and the Judge of the Court had examined the same. Inasmuch as the report is confidential, no comment is made upon its contents."

Paragraphs 2, 3, 4 and 5 of the Findings say that petitioner has good moral character and true love and affection for the infant boy; that he is sincere in his request to adopt the boy; that his request is based solely on his love and affection for the boy and that "Mrs. Schenker desires him to adopt the boy"; that the Schenkers have created a wholesome home atmosphere as between themselves and as between themselves and the boy.

Paragraphs 6, 7 and 8 are the only ones that deal with Mr. Blumenthal in connection with this action. These read:

"6. I find that the said Harvey J. Blumenthal, since his divorce, has not properly provided for the said infant boy; and that, although he has resided on the Island of St. Thomas since his divorce, has not made any effort to see his son, Lance, or to act toward the said boy in a way which a natural father should act toward his son. He has made no attempt to see the boy; he has made dates to see the boy, and has broken those dates without any explanation or without notifying the boy that he could not come, and this has happened on many occasions.

"7. His actions and his failure to visit with his son has not been caused by any action on the part of the boy, Lance, or upon the part of this mother, Helene Schenker, but has been due entirely to his failure to show the proper consideration and affection for the infant boy; and that his failure to see the boy and visit with the boy has extended over such a long period of time as to amount to a desertion of the boy.

"8. That it would be in the interest of the boy and for the good

238

of the boy to be adopted by the said Heinz P. Schenker to whom the boy is greatly attached by love, affection and respect."

In the order the court says preliminarily:

"The petition being based upon the failure of the natural father, HARVEY J. BLUMENTHAL, to provide proper care and maintenance of the said child, LANCE DRESDNER BLUMENTHAL, and his desertion thereof;"

And later in outlining the basis of its decision:

"The Court having considered the best interests of the minor child and having considered the argument of counsel and the testimony given, and having made its findings of fact and conclusions of law,"

In summation the attorney for the petitioner said: "The boy has definitely drifted away from him (Mr. Blumenthal) * * * The boy doesn't consider he has a father. It is a case where, if he is permitted to be adopted by Mr. Schenker, he will for the first time have what he considers a father." When the attorneys had concluded the judge said, "I want to talk with Lance" and did so in private. After that the judge commented to counsel "I'm not going to tell you what the boy said. He didn't hesitate. He's very fine." Regarding the proceeding he remarked, "The word 'desertion' in that statute, that's the interpretation it calls for." He also mentioned that "There is nothing in the divorce proceedings to make him support his child, which is unfortunate."

■ From the above we know that Section 142(b) of the controlling Virgin Islands Code in the circumstances before us requires willful desertion and neglect to provide for the child for the year immediately preceding the filing of the petition in order to make out a statutory cause of action which could result in the court handling the application as if Harvey Blumenthal, the father of Lance, "was dead" and allowing Schenker to adopt him in the language of the order "as * * * if he were the natural born son of

239

the said Heinz P. Schenker" with his name changed by the order from Blumenthal to Schenker. Shumway v. Farley, 203 P.2d 507, 511 (Ariz. 1949). The Arizona statutory exception is identical with the one before us.

■ We hold that this statute with its terrible punishment is to be construed strictly. Even without such ruling, the petition on its face not only omits mention of or reference to alleged "willful desertion" by the father but there is not one word in it which can be rationally construed to carry a "willful desertion" connotation. And there is nothing in the entire trial testimony that directly or by legitimate inference points to willful desertion by the father of his son. There is no need of spelling out the pitiful plight of Blumenthal in trying to maintain his father-son relationship under completely changed environment of the youngster. The grim picture presented by the material quoted from the whole record, whatever else it shows, certainly reveals no present trace of Blumenthal in the life of his son. And it also reveals the reason for the lack of accusation that Blumenthal had willfully deserted Lance. The 1958 divorce decree continued the custody of Lance in Mrs. Blumenthal and the father was not granted any visitation right at all. His sole chance to see Lance or talk with him was at the whim of the woman who had divorced him. Nor was there any demand for support made either for the plaintiff or for Lance "due to the present financial circumstances of the defendant." That was reserved for future determination but to date has not been raised. The father's unfortunate economic situation is gone into at some length in the testimony and has not been seriously disputed. Eventually he obtained a job in the Post Office which he now has and his material status has undoubtedly somewhat improved. Irrespective of this he never refused Mrs. Schenker money when she asked him for it and he did borrow $500 from his father and gave her that when she requested

money for the boy's schooling. Excepting that one school money incident it is apparent that contribution from Blumenthal was unimportant. The Schenkers, each of them with independent income, had the boy with them by the divorce decree and by their own wish. There is no suggestion that the father was ever given the opportunity of Lance living with him and being taken care of by him—except just for that one night in the whole two years before this action.

■ The trial court, neither in its findings of fact or conclusions of law or elsewhere in the record, makes mention of "willful desertion." It does not hold Blumenthal guilty of willful desertion. That conclusion is a sina qua non under the statute. The court found the facts above quoted. It was most conscious of the statute with respect to desertion. It concluded that the facts made out "desertion" but refused to hold they constituted "willful desertion." In the order allowing the adoption the court, referring to the petition, said it was based "upon the failure * * * to provide proper care and maintenance * * * and desertion * * *." There again, the court rejects implication of willfulness. Beyond all doubt, willful desertion was never charged directly or indirectly in this case and was never found by the court. Of itself this defeats plaintiff's petition. However, the record before us goes much further than simply the elimination of willful desertion from the proceeding. On all the evidence there is no factual support for the finding that Blumenthal deserted his son in the year prior to the filing of the adoption petition or ever and we so hold.

■ Going now to the other vital element which the statute demands before this type of adoption can be allowed i.e. "neglected to provide proper care and maintenance for the child for one year * * *." The petition so charges and that, as we have seen, is all it charges. Finding of Fact #6 in effect makes the same statement but with the legal and actual custody of the boy being in Mrs. Schenker and sup-

241

port by Blumenthal intentionally eliminated from the decree, the finding is clearly wrong.

 This suit from the beginning went off on erroneous tangents. It was never focused on the statute to which it owed its existence. We are satisfied that the misdirection was primarily the fault of the attorneys. The petition on its face did not present a cause of action within the law. It should have been moved against by the attorney of the objector. The closing argument by the petitioner's attorney concentrated on the alleged desires of the boy with not one word said as to whether the petitioner's proofs had complied with the statute. The attorney for the objector did state twice during the closing colloquy, the statutory requisites. But there was no allusion whatsoever by him to the fact that the statute and qualification under it had never been pleaded or that there had been no attempt to even make out a prima facie case within the pertinent section of the Code. At that stage the judge, a most kindly, warm hearted person, with, as he said, "a hard decision before him" and the highest motivation, expressed a desire to talk to the boy privately. This was not some marital hearing involving custody of a child. Whatever the decision the custody of the child could not be disturbed in this action. We are dealing with a rigid statutory process that could end in the total destruction of Blumenthal's fatherhood. Nevelos v. Raulston, 335 P.2d 573 (N.M. 1959) ; Hangartner Adoption Case, 407 Pa. 601 (1962). It was not the occasion for a secret, plenary interview with a ten or eleven year old boy, the result of which definitely weighted the court's ultimate conclusion. Both lawyers should have so advised the court. There was no jury present, the judge and Lance knew each other and were friends. Lance, as the judge noted later, was an "alert boy" who "didn't hesitate" to talk to the judge. The trial evidence was that he had been intentionally avoiding his father. In the circumstances there

was no reason why Lance could not have been examined in open court. In the same category appears the confidential report of the Welfare Department which the judge examined. This too, should have been subject to examination, to objection, to contradiction. There is nothing to indicate that its presence at the hearing was not known to the attorneys. If it was, the court should have been alerted to the error of privately reading a document which was not in evidence in this carefully circumscribed proceeding. Obviously, the report may well have had an important bearing on the court's determination.

The judgment of the district court will be reversed and the case remanded to that court with instructions to enter judgment denying the petition herein with costs and a reasonable attorney's fee to be taxed in favor of the objector, Harvey J. Blumenthal.