## Owen Adoption

*Harry Sewinsky,* for petitioner.

*Francis Fornelli,* for respondent.

ACKER, J., March 29, 1971.—The matter for determination arises from a petition for involuntary termination filed pursuant to the Adoption Act of July 24, 1970, 1 PS §101 et seq. To this an answer was filed, the issue joined and testimony taken. The court makes the following findings of fact.

## FINDINGS OF FACT

1. In 1965, the natural father, Phillip Owen, then age 17, was a ninth grade student in the Reynolds area schools, failing most of his subjects and attempting to proceed with an I.Q. of 85.

2. Winifred June Boger at this same time was likewise in the ninth grade of the same school and had become pregnant through relations with Phillip Owen. She was then age 15.

3. The parties became married on March 30, 1965, and on September 12th of that year Tad Dean Owen was born.

4. The marriage between the parties was very stormy with frequent separations, culminating with Phillip leaving his wife by her request shortly after the birth of the child.

5. The baby's first Christmas was that of 1965 and the natural father, Phillip, brought to the child a silver engraved cup and spoon and a doll.

6. The child's first birthday on September 12, 1966, caused the father to send to the child a birthday card with a $20 bill enclosed, which was returned in another

sealed envelope from the natural mother. The card was torn into numerous pieces, but was put back together by the father for he had noticed certain writing upon it of his former wife's stating, "Keep your stinking money for your next illegitimate child." The $20 bill had been ripped in two.

7. Between the father leaving the residence and the return of the card, the father voluntarily paid support of approximately $100.

8. No money has been paid for support of the child by the father after its first birthday in 1966, nor has there been any request for money.

9. The natural father has not sent any other gifts, nor has he personally seen the child other than a fleeting glimpse as he would pass the house since 1966.

10. The father on June 5, 1967, pled guilty in the criminal courts of Mercer County to the charges of burglary and larceny and was on June 5, 1967, placed on probation for a period of one year conditioned on his making restitution, that he keep gainfully employed, that he observe all of the laws and that he report to the probation office as directed.

11. The natural mother's father, with whom she lived, was a large and forceful man who had no great attraction for respondent and who informed respondent that he did not want him around the house at any time. Despite this warning, respondent desired to see his child in 1966 and was at the house on one occasion when the father returned and he ran out the back door with the father in pursuit. Respondent was afraid of the father.

12. On another occasion in 1966 or 1967, Trooper William Daly of the Pennsylvania State Police saw respondent and informed him that a complaint had been made by his former wife that he had been prowling about the residence of the former wife and her

parents and that if this was repeated, he would be arrested. At this time, respondent had been placed on probation and was concerned that he would get into further difficulty if he came to the residence of his wife and her parents to see the child.

13. The natural father at various times has had three pictures of the child, at least one of which he carried in his wallet regularly and showed to his friends on many occasions with pride and regret.

14. Petitioner became divorced from respondent on April 12, 1966.

15. Petitioner married Donald Leonard on March 10, 1967, but lived with him but two weeks resulting in a divorce granted on February 1, 1968.

16. On February 9, 1968, petitioner married Gerald Crestwell, her third husband, and lived at 745 Dutch Lane for approximately a year. She then moved to R. D. 1, Hadley, where she resided for about a year and then to her present address at R. D. 2, Hadley, where she has resided for approximately a year.

17. During most of the period from the birth of the child until her marriage to Mr. Crestwell, the child resided with her parents, but has resided with herself and her husband almost continuously since the marriage in 1968.

18. Between respondent leaving in 1965 and her marriage to Mr. Crestwell in 1968, petitioner resided at the home of her parents the vast majority of the time.

19. Although respondent was confronted by the present husband of petitioner prior to the marriage of petitioner and her present husband and respondent was told to stay away from his former wife, being the petitioner, he was not in any way warned to stay away from the child, nor was he denied the right to see or visit the child at any time by petitioner's present husband or by petitioner herself.

20. Petitioner's father, of whom respondent was physically afraid, died on June 5, 1970.

21. Respondent inquired of his friends and a Mrs. Dorothy Gilson, an employe of a drug store in the area where Mrs. Crestwell lived, about his child and received occasional reports as to his well being.

22. Respondent stated that he was not concerned about the welfare of the child because he knew petitioner would take good care of the boy.

23. Respondent did not know whether the Crestwells had a telephone, nor exactly where the home was located, but he did know that they lived in the Hadley area.

The legislature in 1970 passed an Adoption Act effective January 1, 1971, PS §101, et seq. Section 311 thereof provides grounds for involuntary termination. Subsection (1) provides:

"The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties . . ."

The natural father contends that this language has not changed the previous law as to abandonment and, therefore, that all of the cases concerning abandonment decided thereunder are equally applicable. We cannot agree with this position.

Abandonment was formerly defined as, ". . . conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties."[1]

A reading of the two statutes is, in itself, sufficient answer to defendant's contention. The 1970 statute provides that abandonment may be by "either" "or," whereas the former statute has the conjunctive "and."

The Joint State Government Commission in a pub-

---

[1] Act of December 21, 1959, P. L. 1955, sec. 1, 1 PS §1.

lished comment concerning the adoption statute prior to its passage on page 7 provides in Comment:

"This section is derived from Section 1.2 of the 1925 Act, which required a finding of abandonment for at least six months as codified in Clause (1). However, the grounds for abandonment have been broadened; relinquishment of parental claim or failure *or* refusal to perform parental duties is now sufficient."

Therefore, many of the cases dealing with abandonment under the previous statute are not now controlling. For example, it was previously held that mere neglect is not sufficient: Hunter Adoption Case, 421 Pa. 287, 218 A. 2d 764 (1966); Snellgrose Adoption Case, 425 Pa. 258, 228 A. 2d 764 (1967).

Or the rule that abandonment means total and complete relinquishment by a parent of his or her own flesh: Rettew Adoption Case, 428 Pa. 430, 239 A. 2d 397 (1968).

It is still true that the test of abandonment is the performance or nonperformance of parental duties as opposed to the existence or nonexistence of those parental rights: Wischmann Adoption Case, 428 Pa. 327, 331, 237 A. 2d 205 (1968). Schwab Adoption Case, 355 Pa. 534, 50 A. 2d 504 (1947); Best Adoption Case, 413 Pa. 253, 196 A. 2d 342 (1964).

Under the Act of 1970, using the disjunctive "or," the refusal or failure to perform parental duties would, as previously, permit a consideration of whether the parent supported the child, but the failure to support in itself, although a factor to be considered, standing alone would not be conclusive: Hangartner Adoption Case, 407 Pa. 601, 181 A. 2d 280 (1962).

It would appear, however, that this case is perhaps as close to the factual situation of Jacono Adoption Case, 426 Pa. 98, 231 A. 2d 295 (1967), as any recent reported appellate case. In that case, defendant had

been incarcerated from 1962 to 1964 in a penal institution. From 1962 to June 30, 1966, his only attempt to communicate with his son was a Christmas card sent in December of 1963. This card was returned by the natural mother and unread by the child. During the next two and one-half years, the father did not communicate with his son or with the wife concerning the child. Following his release from prison, he made no effort to contribute to the son's support. The natural mother testified that the father was indifferent towards the son from the time of his birth. The lower court refused to sustain the contentions of the natural father and permitted the adoption to stand. This was sustained on appeal. This case, of course, was decided prior to the 1970 statute.

The difference in the present factual situation and the Jacono case, supra, is that there was no testimony that the father had any continued interest or desire to see the son. In this case, accepting the father's testimony at its best, he had some lingering hope or desire at some unspecified and undertermined time in the future to come to court to have custody rights fixed for himself, at least as to visitation. When, if ever, this might have occurred cannot be answered. However, it is clear that under the present statute he completely failed to perform his parental duties. We take these parental duties to be much more than mere nonsupport, which he claims the wife refused. We believe that this includes a desire to see his son, to communicate with him, to be concerned and to evidence that concern as to his welfare. We do not believe that a parent can now view a child while driving down a road playing in his backyard and thereby satisfy his parental obligations. Nor do we believe that a father can fulfill his parental duties by testifying that he was satisfied that the mother would care

for the welfare of the child. It may well be that the mother will do so, but this is no relief to him. A father has an obligation if he wishes to preserve his rights to do something overt to demonstrate his continued desire to assume parental responsibilities. A lingering hope to be a father is not sufficient in law or fact to satisfy the requirements of the statute.

The present factual situation is exactly what the legislature intended to cover by section 311, subsec. (1), in the 1970 statute. No longer may parents deny their children the opportunity to have the security of a father by adoption who will assume, and in many cases has for years previously assumed, the parental responsibilities which the natural father has so freely neglected. The parent must now make an effort to perform his parental duties.

Previous cases have held that the knowledge of the whereabouts of a child is essential to proof of persistence in establishing abandonment: Ashton Adoption Case, 374 Pa. 185, 199, 97 A. 2d 368 (1953). This court does not feel that this respondent can use that as a defense. He acknowledged knowing that his child was in or about the community of Hadley, although he stated that he did not know the exact address. The community of Hadley in Perry Township in which they lived by the latest census figures was 1,368. He knew the area in which they lived. Certainly, if he desired to assume any responsibility towards this child, he could undertake to find his exact address. Once the natural maternal grandfather was deceased, well over six months ago, there was no excuse that the natural father could advance for not assuming his responsibilities.

One contention remains to be answered. If it be accepted that respondent did have a continuing desire to assume parental responsibilities and thereby not abandon his child under the previous adoption stat-

ute,[2] can this respondent be bound by the broadened definition of abandonment in the 1970 statute? The logic advanced is that the involuntary termination can occur only through conduct continued for a period of at least six months. In that this petition for involuntary termination was filed on February 27, 1971, and the statute did not become effective until January 1, 1971, a six-months period of abandonment as now defined under the statute has not occurred since the effective date of the statute. The act, however, was approved by the legislature on July 24, 1970, to take effect on January 1, 1971. Section 602(a) provides that the act shall apply to all proceedings begun on or after January 1, 1971. Could this then mean that involuntary termination under the enlarged definition of abandonment by section 311 would be applicable only for actions of adoption filed on or after July 1, 1971? We do not believe so, for if the legislature had so intended they would have so stated. Nor is the statutory construction act dealing with the presumption against retroactive effect ignored.[3] This statute provides:

"No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."

However, we believe this case to fall within the rule that a statute is not retroactive merely because a part of the requisites for its action is drawn from a time antecedent to its enactment. This rule permits the consideration of facts and conditions antecedent to the enactment of the statute in determining the applicability of the statute to the factual situation then presented: Burger Unemployment Compensation Case, 168 Pa. Superior Ct. 89, 77 A. 2d 737 (1951); Philadelphia, to use v. Phillips, 179 Pa. Superior Ct.

---

[2] Act of April 4, 1925, P. L. 127, sec. 1, et seq., as amended, 1 PS §1.

[3] Act of May 28, 1937, P. L. 1019, art. IV, sec. 56, 46 PS §556.

87, 116 A. 2d 243 (1955); Creighan v. Pittsburgh, 389 Pa. 569, 132 A. 2d 867 (1957).

Wherefore, this court grants the prayer of the petition for involuntary termination.

## ORDER

And now, March 29, 1971, it is hereby ordered and decreed that the prayer of the petition to terminate by involuntary termination the parental rights of the natural father, Phillip Lee Owen, concerning the child, Tad Dean Owen, is granted and all parental rights of Phillip Lee Owen concerning Tad Dean Owen are hereby terminated.

