## Spicer's Adoption

*Frank S. Moser*, for petitioners.
*D. W. Kearney*, for respondent.

TROUTMAN, J., May 19, 1947.—Elmer L. Rook and Sarah A. Rook presented their petition for the adoption by them of Bonnie Dianne Spicer, a minor, and an order was made designating a time for hearing thereon. A written notice of the time fixed for the hearing was given to Chester Spicer, the natural father of the minor, by registered mail. An answer to the petition for adoption was filed by the natural mother of the minor, Sarah E. Spicer. The hearing was held on January 18, 1947, at which time petitioners ap-

peared with witnesses in their behalf. The natural mother of the minor, Sarah E. Spicer, appeared in person. The natural father did not appear, being confined in jail at Bellefonte, Pa.

*Findings of fact*

1. Petitioners, Elmer L. Rook and Sarah A. Rook, are husband and wife and are citizens and residents of the Borough of Shamokin, County of Northumberland and Commonwealth of Pennsylvania.

2. Bonnie Dianne Spicer is the minor child of Chester Spicer and Sarah E. Spicer, having been born on November 7, 1944, in College Township, Centre County, Pa., and is two years of age.

3. Chester Spicer, the natural father of Bonnie Dianne Spicer, has been a prisoner in jail at Bellefonte, Centre County, Pa., and was so confined at the time of the hearing.

4. Sarah E. Spicer, the natural mother of Bonnie Dianne Spicer, is a resident of the Borough of Shamokin, County of Northumberland and State of Pennsylvania, and has resided therein since October 1945.

5. The minor, Bonnie Dianne Spicer, is now in the care and custody of petitioners, Elmer L. Rook and Sarah A. Rook, in the Borough of Shamokin, County of Northumberland and State of Pennsylvania, and has been in their care and custody since October 6, 1945.

6. The consent of the natural father, Chester Spicer, and the consent of the natural mother, Sarah E. Spicer, to the proposed adoption have not been given.

7. The natural mother, Sarah E. Spicer, did not abandon her minor daughter, Bonnie Dianne Spicer.

8. There is not sufficient evidence upon which to base a finding of fact that Chester Spicer, the natural father, abandoned his daughter, Bonnie Dianne Spicer.

## Discussion

This petition is presented under the Act of April 4, 1925, P. L. 127, sec. 2, 1 PS §2, which provides in paragraph (c) that the consent of the parents to an adoption is necessary, but "the consent of a parent . . . who has abandoned the child is unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact".

In this case, neither the mother nor the father have consented to this adoption. The father is in prison and was not present at the hearing, and the mother, who was present at the hearing, filed an answer to the petition for adoption denying that she ever abandoned her child and also stated in the answer that the father had never abandoned his child. Therefore, the requisite consents declared by the act of assembly not having been obtained, before a decree of adoption can be entered, it is necessary to determine whether or not the father and the mother have abandoned their minor child: Petition of Sulewski et al., 113 Pa. Superior Ct. 301; Schwab Adoption Case, 355 Pa. 534, 542.

What constitutes abandonment has been discussed in various cases. Thus in Weinbach's Appeal, 316 Pa. 333, 339, the Supreme Court stated that, "The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parents which evinces a settled purpose to forego all parental duties and relinquish all parental claim to the child".

Abandonment of a child may be effected by a formal legal instrument or merely by conduct evincing a settled purpose to forego all parental duties and relinquish all parental claims. It is a matter largely of in-

tention, to be ascertained from the circumstances: Hazuka's Case, 345 Pa. 432; Schwab Adoption Case, supra.

The question, therefore, is whether the father and the mother, by their conduct, evinced such an intention to abandon their child and to forego all parental duties and to relinquish all parental claim. A review of the evidence convinces us that the testimony is not sufficient to support a finding of abandonment by either the father or the mother.

Mrs. Sarah Spicer, together with her three children, Bertha, Jean and Bonnie Dianne, the minor daughter whose adoption is sought in this proceeding, came to Shamokin in October 1945, and through the efforts of Captain Baker of the Salvation Army secured a house near the residence of petitioners. At the request of Captain Baker, several children of petitioners went to the Spicer home for the purpose of taking the children to Sunday School, and it was in that way that petitioners and Mrs. Spicer became acquainted. A daughter of petitioners brought the child to their home on October 5th and kept her for the day and then returned the child to her mother. On October 6, 1945, the daughter again brought the child to the home of petitioners where she has remained.

It was the testimony of Mrs. Rook, one of the petitioners, that on October 6th, Mrs. Spicer asked her to take care of the baby for a couple of days until she could get her mother's assistance from Bellefonte; that when she received the child it had no clothing and had body sores; that since she has had the child she and her husband have cared for and maintained the child, the mother or the father not having contributed any money or clothing toward the child's support; that while she saw the mother several times after taking the child, the mother never asked that the child be returned to her. Elmer Rook, the other petitioner, testified that

the child had been in his home since October 6, 1945, and that a week or two after that date, Mrs. Spicer asked whether he would keep the child as she did not have any heat, water or lights, and on cross-examination, he testified that it was a temporary arrangement whereby he would look after the child until Mrs. Spicer got better situated to take care of it. He denied that Mrs. Spicer had ever made a request to take the child back, and that from October 6th he and his wife supported the child entirely and that the mother never contributed anything toward the child's support nor did she ever give the child a present.

A reading of the testimony offered by petitioners clearly indicates that the natural mother of the child had visited the Rook home on five or six occasions and had also met them on the street when they had the child in a go-cart. It further indicates that petitioners took the baby to Mrs. Spicer's home several times.

The natural mother, Mrs. Spicer, testified that a daughter of petitioners came to her home and asked to take the baby, Bonnie Dianne, to the Rook home and that she never had any intention that the Rooks should permanently keep her child and that right from the beginning when she would go down, Mr. Rook would tell her that he would never give Bonnie back; that he came to her house drunk, and threatened what he was going to do; that she would not go down more often because of fear of Mr. Rook; that the last time she went down was in the spring of 1946; and that she denied that her child had been neglected. She further testified that she did go to Mr. Wiest, who is a member of the Northumberland County bar, in order to determine her rights to get the child returned to her, which was about three months prior to the date of the hearing. No proceedings were ever instituted to obtain custody of the child.

The daughter of petitioners, who evidently was acting in behalf of her parents in getting the child into petitioners' home, was not called as a witness, and, consequently, we are deprived of any testimony which might have been obtained from her as to what took place between her and the mother in relation to the purpose of petitioners taking the child.

Petitioners contend that the mother asked them to keep the child until she could get better situated financially, and the testimony of the mother indicates that petitioners offered to take the child until such time as the mother was in a better financial position. It is not disputed that the mother was quite poor and had to rely on public assistance to support herself and her family. When she first moved to Shamokin she was dependent upon charity to secure a home and furniture. The testimony indicates that petitioners, who are members of the Salvation Army, were also interested in seeing that she acquired a proper home and was sufficiently maintained. The record clearly indicates that the child was entirely supported by petitioners, and while failure to support has always been looked upon as evidence of abandonment, if the failure has been due to circumstances beyond the control of the parent, then the fact of nonsupport loses much if not all of its probative value. See Snyder's Adoption, 61 Montg. 276.

Petitioners took the child into their home because of the mother's inability to support the child, and at least for a considerable period of time the mother was entirely dependent upon public aid to support even herself. Petitioners contend that, inasmuch as they have supported and cared for the child and that the mother did not evince any interest in its welfare and did not ask for the child's return, therefore, she has abandoned the child. However, inasmuch as the original arrangements were of a temporary nature and petitioners were anxious to keep the child because

of the conditions in the home of the mother, it seems to us that petitioners should have taken some positive action with the mother concerning the child's future.

The mother's contention is that she did want her child returned to her but that petitioners refused to do so and that when she sought the child's return, she was rebuked by threats and abuse on the part of petitioner, Elmer Rook. After carefully reviewing the entire testimony, we are satisfied that the mother did seek the return of her child. There is no question that petitioners have become attached to the child and have been maintaining and supporting the child in a satisfactory manner. However, this fondness and attachment gave petitioners no right to refuse the mother the opportunity to see the child and even regain its custody. Petitioner, Elmer Rook, testified that he wanted to keep the child because he did not want to see it neglected. The mother cannot be held to have abandoned the child where she has been prevented from assuming her parental duties by reason of the conduct of petitioner.

Since abandonment of a minor child by its parents is largely a matter of intention, and inasmuch as the intention must be gathered from the conduct of the parents in this case, the burden to establish that fact is on the party who asserts it and abandonment should be clearly proved: Welker's Adoption, 50 D. & C. 573. We are of the opinion that petitioners have not met the burden placed upon them to establish that fact to the satisfaction of the court.

There is not sufficient evidence in this case to indicate that the father has abandoned this child. While the record indicates that notice of this hearing had been given the father, it is admitted that he is now in jail and no doubt was not in a position to appear at the hearing. There is nothing to indicate the father's disposition concerning this adoption, except that the

mother in her answer denies that the husband had abandoned the child. The only evidence concerning the question of abandonment on the part of the father is that which has been obtained from the mother. It appears that the Spicers had marital difficulties and that the mother had separated herself from the father, taking her children with her to Shamokin. The father was evidently imprisoned some time later. The testimony shows that the wife left her husband but there is nothing to indicate that because of the separation of husband and wife there was any intention on the part of the father to abandon his children. The testimony of Mrs. Spicer shows that before she came to Shamokin, Mr. Spicer took care of the children.

There is some testimony by Mrs. Spicer that her husband never inquired concerning the children and that he does not want anything to do with the children. These are mere conclusions and, certainly, in the absence of the father, cannot be used to show an intention to abandon on his part. The mere fact that failure to support a minor child is due to the imprisonment of her natural father does not of itself show that he has abandoned the child, and the burden is upon petitioners to establish the fact of abandonment by the natural father. The conviction of crime and its imprisonment thereof is not within the meaning of abandonment as used in the laws relating to adoption, and such imprisonment can only be made an exception to the rule requiring the parent's consent by an act of the legislature. The only exceptions to the rule requiring the consent of a natural parent are that the consent of a parent who has been adjudged a lunatic, or a habitual drunkard, or who has abandoned the child is unnecessary. See Welker's Adoption, supra; Adoption of Julia Ann Grabowsky, 24 Westmoreland 162.

There is no evidence upon which to base a finding that the father has actually abandoned his child. At the hearing on this petition there was no effort made

to show when the father had been convicted, when his sentence began and when it would expire. As has been previously stated, the burden is upon petitioners to show abandonment.

Unquestionably, petitioners have given the child a good home and have properly supported and maintained her, they are fond of the child and no doubt a very strong attachment has grown up between them and the child and the adoption asked for may be advantageous to the child and her material welfare. However, the welfare of the child is not sufficient ground for the decree of adoption, unless based on the necessary consent of the parents, or on the distinct finding that the parents not consenting have abandoned the child. Consideration of what is beneficial for the child is vital in custody cases, but cannot be regarded as evidence of abandonment: Schwab Adoption Case, supra.

The public policy giving parents natural guardianship of their children is based upon deep and compelling principles of human nature. The courts should act with great caution in causing a dissolution of family ties for one of the most sacred ties in life is that of parent and child. That relationship should be protected unless the parents have deliberately failed to perform the duties of parenthood and have abandoned the child to the mercies of the world. In Pennsylvania, a valid adoption severs the child from its natural family tree and engrafts it upon that of its new parentage. Thereafter the child attains the status, in law, of a natural child of the adopting parents: Cave's Estate, 326 Pa. 358; Schwab Adoption Case, supra. Consequently, in order to find that a parent or parents have abandoned a child, that fact should be clearly proved. We are of the opinion that the testimony in this case is insufficient to show an intention on the part of the father and the mother to abandon this minor child, and therefore, we are obliged to refuse the prayer of

petitioners. However, it must be clearly understood that in so doing we are not in any manner determining the question of the custody of the minor child, either now or in the future.

### Decree

And now, to wit, May 19, 1947, after hearing and careful consideration, it is ordered and decreed that the petition for the adoption of Bonnie Dianne Spicer be and the same is hereby dismissed at the cost of petitioners.