## Commonwealth ex rel. Robinson v. Ziegler

*Carl G. Herr*, for petitioner.

*W. Lloyd Snyder, Jr.*, for respondent.

WISSLER, P. J., July 29, 1964.—At the conclusion of the hearing in the above matter the Court entered an order awarding the custody of Lynn Ziegler to relator, Theodore M. Robinson, Jr., the putative and acknowledged father. An appeal has been taken from this order to the Superior Court of Pennsylvania, and this memorandum opinion is being filed pursuant to Superior Court Rule 46.

From the evidence presented at the hearing and the demeanor of the witnesses, the court determined that the welfare and interest of the infant child would best be promoted by awarding the custody to the relator, the acknowledged father.

At the time of the hearing the following stipulation was entered into:

"Counsel for the respective parties to the above action hereby stipulate that the following facts shall be made a part of the record of the case without proof thereof by witnesses:

"1. Kay Ziegler, one of the defendants, is properly known as Kathryn Ziegler; she is a minor female who was born on July 23, 1947, and will be 17 years of age on July 23, 1964.

"2. Said Kathryn Ziegler gave birth to a female child at Wilmington, Delaware, on May 21, 1964, during which time she was residing at the Florence Crittenden Home at Wilmington, Delaware.

"3. The said child born of Kathryn Ziegler on May 21, 1964, as aforesaid, bears the name Lynn Ziegler.

"4. Said Lynn Ziegler is the child who is the subject of this habeas corpus proceeding.

"5. Prior to and at the time of the birth, said Kathryn Ziegler was unmarried, and on this date remains unmarried.

"6. The baby Lynn Ziegler is the illegitimate child of Kathryn Ziegler, and it is admitted by said Kathryn Ziegler and by Theodore M. Robinson, Jr., one of the relators in this action, that the latter, also unmarried, is the father of the baby.

"7. Theodore M. Robinson, Jr., relator and father of said Lynn Ziegler, is of the Negro race; Kathryn Ziegler, defendant and mother of said baby, is of the Caucasian or white race; from the physical appearance and coloring of the baby Lynn Ziegler, it is evident that at least one of the parents of said baby was of the Negro race.

"8. That at or about the time of the birth of said baby, a similar habeas corpus proceeding by the present relators in this action was commenced against Kathryn Ziegler, mother of the baby, for custody of the baby, in the Family Court of New Castle County, Delaware; that because the relators and said Kathryn Ziegler were all citizens and residents of Lancaster County, Pennsylvania, it was agreed by stipulation of counsel in the Delaware action that said Kathryn Ziegler and the baby might return to Lancaster County, Pennsylvania and that the baby might be placed under the supervision of Family and Children's Service of Lancaster County (one of the defendants herein), pending decision of legal proceedings; said stipu-

lation, however, reserved to the defendants the right to assert any jurisdictional defense available to them in said Delaware action; said Delaware action remains in said status, and the hearing on said action has been postponed from time to time pending the results of this present action. For the purpose of this action it is agreed that the proper jurisdiction for determination of the custody of the baby is in the Court of Common Pleas of Lancaster County, Pennsylvania, and that the only effect of the aforesaid reference to the Delaware action is to evidence the vigilance of Theodore M. Robinson, Jr., and his parents in pursuing custody of said Lynn Ziegler. It is the intention of relators in this action to discontinue the Delaware action upon conclusion of this proceeding.

"9. That Kathryn Ziegler, upon her return to Lancaster, Pennsylvania, in fact placed the baby Lynn Ziegler under the supervision of the Family and Children's Service of Lancaster County, one of the defendants herein, and said Service still retains the supervision of the baby.

"10. That on June 24, 1964, after institution of this proceeding and after service of the writs upon all of the defendants, said Kathryn Ziegler, joined by her parents, petitioned the Orphans' Court of Lancaster County, Pennsylvania, for a Decree, under the Adoption Act, voluntarily relinquishing custody of baby Lynn Ziegler to Family and Children's Service of Lancaster County, defendant herein, and the Orphans' Court has fixed two p.m., July 17, 1964, as the time for the hearing on said petition. That Theodore M. Robinson, Jr., father of the child and relator herein, is not a party to the petition for voluntary relinquishment, and has been given no formal notice thereof.

"11. That the relators in this proceeding excuse the defendants, under the writs heretofore served, from producing the body of the baby Lynn Ziegler in Court

at the forthcoming hearing; relators reserve, however, the right to insist on future production of the baby, as the case may require."

The putative father of a bastard, if a suitable person, is entitled to its custody as against every person but the mother: Pote's Appeal, 106 Pa. 574. This case was followed in Commonwealth ex rel. Human v. Hyman, 164 Pa. Superior Ct. 64. In the instant case the mother, subsequent to this custody proceeding, voluntarily relinquished custody of this infant baby, Lynn Ziegler, to the Family and Children's Service of Lancaster County, Pa., for adoption to which the relator in the present custody proceeding is not a party. We have then not only a putative father, but one who is more than that. He admits he is the father. The respondent, Kay Ziegler, having relinquished her custody subsequent to the institution of the present proceeding, the only question before the court is whether relator, the putative and acknowledged father, is a suitable person as against the present custodian of the minor child, the Family and Children's Service of Lancaster County, Pa.

The facts of the case as to the question of the relator, the acknowledged father, being a suitable person are briefly as follows:

The relator and acknowledged father is of the Negro race, unmarried and living with his father, Theodore M. Robinson, Sr., and mother, Lillian C. Robinson, at 239 Green Street, Lancaster, Pa. He also has three sisters living in the same residence. In the winter he is a student at Maryland State College, Princess Anne, Maryland, having finished his Freshman year there with a "B" average. He is studying sociology striving for professional work as a Social Worker. During the summer he is employed at the Royal Paper Products Company at Coatesville, Pa. The child was born to Kay Ziegler at the Florence Crittenden Home in Wilming-

ton, Delaware, and $400.00 was paid by relator's father toward the cost of same. Relator asked for the custody of the child when it was born rather than having it adopted. He wants the custody because it is his child and his parents are willing to keep the child. He would return from school during certain weekends. He gives as a further reason for wanting the child's custody, testifying as follows: "Q. Now will you explain to the Court why you think it would be to the best welfare of the child that you should have the custody of this child rather than someone else? A. Because I feel it would be better for Lynn to grow up knowing that she has one parent—Lynn, that's the child's name—it would be better for her to grow up knowing that one parent loves her and wanted her than to grow up in an orphanage and know that she had no one."

He has never been in any trouble with the law and is a member in good standing in the local Ebenezer Baptist Church. The only reason the mother, Kay Ziegler, gave for refusing to turn the child over to him as the father was that it would be difficult for her to live in the same town knowing the child was being raised in the same town also.

The father of the relator has an annual income over $9,000. The house in which he and his wife live has eight rooms and bath, five of which rooms are bedrooms. Both he and his wife are willing and agreeable to have relator bring the child to live with them and properly rear the child financially and otherwise, give it the same affection and care as they would give their own.

The testimony of Barbara Flaherty, in the opinion of the court, is most germane to the question of custody before it and will quote in full her direct and cross-examination as follows: "(By Mr. Herr): Q. Your name is Barbara Flaherty? A. Yes, sir. Q. And where do you live, Miss Flaherty? A. 450 East King Street,

Lancaster, Pennsylvania. Q. Is it Miss? A. Yes, it is Miss. Q. What is your occupation? A. I'm a teacher—secondary school teacher. Q. And where do you teach school? A. Lancaster County Day School, Lancaster, Pennsylvania. Q. Now do you know Theodore M. Robinson, Jr.? A. Yes, I do. Q. Do you know Theodore M. Robinson, Sr., and Lillian C. Robinson? A. Yes, I know both of them. Q. For how long have you known these people? A. I would say about eight years. Q. How did you get acquainted with them? A. Well, I took a part-time job at the Lancaster Osteopathic Hospital some years back and I worked an evening shift—it was a small hospital and there were only three of us working together—myself, Mr. Robinson and the telephone operator, Mrs. Stout. Q. And have you known the Robinsons since that time? A. Yes, I consider them very good friends. Q. Now you are of the white race, are you not? A. Yes, I am. Q. How long have you known Theodore, Jr.? A. That would be hard to fix. I would say perhaps four years of those eight. Q. How did you get to know him? A. Well, first of all he came to the hospital in the evenings to help his father work. He was just a young fellow at that time; and then I didn't see him for quite a while and then of course he started to go to school and—I mean McCaskey—and we sort of just naturally since I was at the home three and four times a month I got to know him. Q. You mean in Mr. Robinson's home? A. Yes. Q. And would you have visited their home three or four times a month? A. At least; some months five or six. Q. For some years? A. Yes, that is correct. Q. Now would you describe the home in the sense of cleanliness and a fit place for children to be reared? A. The home is very, very clean; I have never been in that home when you couldn't eat off the floor, as the expression goes; they have ample room for not only the present size of the family but for even two or three more children. Is there

anything else you would like me to say—any other details? Q. As far as your experience goes would you say that this would be a proper home in which to rear a baby? A. Yes, I would think so very definitely because I consider it a happy home. I have been there enough to know that this is true; and I have had enough youngsters talk to me in high school and to know that the one thing that is important to a child is that that child be loved, and I think that this is a home where love is given and given freely. Q. Do you feel that Theodore, Jr., at his age and as the father of a child is mature enough to have custody of the baby? A. Yes, I do, because I think his presence here today in this court requires a great deal of responsibility and I know many an adult that could not do it. Q. And do you feel he understands and appreciates what having the responsibility and custody of this child would entail? A. Yes, I do, I think he feels even more and in years to come if he does not make a fight for this child now he will always wonder where this child is—is the child being well cared for. These are questions one never knows when a child is out for adoption. It may work very well and then again it may not. Q. Do you feel that Theodore, Jr., would properly care for and love this child as a father should? A. I do not think there can be any doubt of that. Q. And do you feel that Mr. and Mrs. Robinson, Sr., are proper persons to maintain this child until Theodore maintains his own home? A. Yes, I think so. I think their presence here today likewise indicates their seriousness of purpose. Q. Would it be your opinion then that if Theodore, Jr., have custody of this child it would be for the best welfare of the child? A. Yes, I do because he is one of the parents; I think of course if the mother of the child should desire the child it should go with her, but inasmuch as she cannot take the child for one reason or another then I think the next logical person would be the father be-

cause in cases of adoption it's very hard sometimes to love those who are not your own; you can't get over the blood relationship ties that exist here.

Cross-examination by Mr. Snyder: Q. You are not concerned then, Miss Flaherty, about the fact that Ted will be at Maryland State and Graduate School for five years? A. No, I am not. Q. And during this period of time the child would be mostly in the company of the grandparents and may come to think of the grandparents as her father rather than Ted? A. I am not, Mr. Snyder, for this reason. I myself was raised by my grandparents and during the depression years my mother was unable to take care of me. My grandparents raised me and I have been eternally grateful to her that she did not turn me over for adoption. She is present in the court room today if you wish to check on that, and I feel that I turned out rather well, I am not boasting or anything but I consider myself well adjusted. Q. You realize there may be some traumatic experience in the future arising out of this or did you consider under the circumstances those who are in this case? A. I believe, sir, that there may be traumatic experiences no matter what is done. We cannot look into the future and tell what would happen. There might be very traumatic experiences with a family who would adopt this youngster with all good intentions and yet something drastic might happen there, too, a child might face some more traumatic experiences with a series of adoptive parents than with its own father. I think this is the—if I may say it—I think this is the only morally right stand that anyone can take. Q. I understand that you feel deeply about this and I now understand your reason for it. It would be possible of course that the child would have a more difficult time in this situation if placed in the Robinson home than as if placed for adoption? A. I do not believe that because among the colored people whom I have

known—and I know quite a few—I think they are a great deal more charitable than the people of my own race in the physical sense of the word, that is I think they accept people more readily and I think the child would fare better with the Robinsons than elsewhere. Q. Were you in the home at any time when Kay was there? A. No, I have never seen Kay until today. Q. Then you have not seen Kay and Ted together there? A. No, I have not, sir.

Cross-Examination by Mr. Appel: Q. Do I understand that you draw a distinction between the love and affection of natural parents and that of adoptive parents. A. Yes, I do. Q. Do you feel that the love and affection of adoptive parents is inferior to natural parents? A. I would not say that it would be inferior but I would say that the occasion would be very rare upon which an adoptive couple could feel the same toward a child as the natural parents could. For example, we all have frailties and when your child does something that is stupid or you wish she would rather have not done I think you can maybe understand why she did it because after all this may be one of your own frailties, but if you are the adoptive parent of the youngster it is very difficult sometimes to try to understand why the child acts like that. Q. And if an adoptive parent observed the child throughout the years does he not acquire an understanding and comprehension of the background and the situation concerning that child? A. He may have but my question would be this: Why have the child be observed over a period of years by a couple when you have here the father of the child who will take this child and there is no question asked, is the child healthy or not healthy—they want this child whether it has three heads or four legs or what; they don't care; they just want the child because it's their child and their responsibility to bring the child up. And I might add that they have even offered to help Kay

put the pieces of her life together again by sending her to school if this would be workable, and beyond all this I think you cannot go."

Respondents deny and contradict some of the testimony of relator, but there is no convincing evidence that relator is not a suitable person or that his father and mother are unfit persons and would not provide a proper home for the child. In fact, Arsenath McCollough, Supervisor of Family and Children's Service, one of the respondents, stated that, except for an absentee parent, the parent of an illegitimate child could and sometimes should have the custody of the child. This court, however, from a reading of the record and after observing the demeanor of the witnesses at the hearing believes the testimony of relator credible and convincing. Apart from the indiscreet relationship that existed between the parents of the child in question there is no other evidence of immorality on the part of the relator.

In Harvey Adoption Case, 375 Pa. 1, it was stated: "Proceedings for the adoption of a child must be carefully differentiated from those involving merely a question of its custody; they are of far greater import and involve more serious consequences. Custody may be awarded for a more or less temporary duration, but a decree of adoption terminates forever all relations between the child and its natural parents, severs it entirely from its own family tree and engrafts it upon that of its new parentage: Schwab Adoption Case, 355 Pa. 534, 536, 50 A. 2d 504, 505. For all purposes, legal and practical, the child thenceforth is dead to the mother who gave it birth; she has lost the right ever to see her child again or even to know of its whereabouts. Because, therefore, of these direful results of an adverse adoption proceeding the rights of the natural parent should not be terminated unless the record clearly warrants such a decree: Southard Adoption

Case, 358 Pa. 386, 392, 57 A. 2d 904, 907." In Commonwealth ex rel. Children's Aid Society v. Gard, 362 Pa. 85, it was held that in a habeas corpus proceeding in the common pleas for the custody of a minor child for whom a guardian has been appointed by the orphans' court, the fact of such appointment is not determinative of the question before the common pleas. In a habeas corpus proceeding instituted on the relation of a Children's Aid Society, guardian of a minor child, to obtain custody of it, for a court to award custody of a minor on a mere statement by the relator that defendant's home is not a suitable permanent home for the child and that relator had a more desirable home, without the court being informed of the pertinent factors supporting such conclusion, would be to delegate the judicial function in such matters to the relator and would constitute an abuse of judicial discretion. The custody of a young child is not a property right of the parent to be made the subject of a contract. At any time during minority, the court will make such disposition of a minor child, whose custody is in dispute, as the circumstances of the case demand, having always in view, first and last, and controlled mainly by the consideration which will best promote the welfare of the infant.