**Snively  Adoption**

*Calvin S. Drayer, Jr.*, for petitioners.
*James L. Hollinger*, for respondent.

TAXIS, P. J., July 24, 1973.—This matter began with the filing of a petition on September 25, 1972, for the adoption of Catherine Alice Snively, a child now about two-and-a-half years of age. Petitioners are Charles Albert Kramer, Jr., and Georgene Alice Kramer, the maternal grandparents of the child.

The child's father, Kenneth Kevin Snively, was given notice of the proceeding and opposes the petition. The mother is deceased. The court was advised that the father, a resident of Florida, had certain financial problems which interfered with his attendance at Norristown, and a hearing on the merits was not held until March 7, 1973, although Mr. Snively's deposition had been taken earlier, on November 9, 1972. The only record before us is the testimony of the father, who was called by counsel for petitioners as of cross-examination.

The issue actually before us now is whether the father's parental rights have been lost. A petition for a decree of termination of the father's rights was filed on May 18, 1973, by petitioners in the adoption proceeding, because the Adoption Act of July 24, 1970, P. L. 620, no. 208, 1 PS §101, et seq., apparently contemplates a separate proceeding for this purpose. See section 414 thereof. We shall, therefore, rule now on this petition only.

The applicable law is section 311 of the Adoption Act of July 24, 1970, which provides that the rights of a parent may be terminated on the grounds that:

"(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; or

"(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent;"

With regard to subsection (1), several decisions rendered since its enactment point up the fact that the statutory language used represents a substantial departure from the provisions in the Adoption Act of April 4, 1925, P. L. 127, sec. 1, 71 PS §1, et seq., relating to abandonment. Several decisions of the Supreme Court under the Act of April 4, 1925, established that the "abandonment" which eliminated the requirement of parental consent to adoption was almost entirely a matter of intent on the part of the parent alone. The welfare of the child, specifically, whether the course of parental conduct had an adverse effect, or whether adoption would represent an im-

provement in the child's manner of life, could not be considered at all in this respect, Gunther Adoption Case, 416 Pa. 237, though it was of paramount importance in custody and similar matters. Thus, relatively minimal efforts by a parent to maintain some contact with the child sufficed to prevent a finding of abandonment. See, for example, Sarver Adoption Case, 444 Pa. 507; Schwab Adoption Case, 355 Pa. 534. As will be seen below, were this matter governed by the Act of April 4, 1925, no abandonment could be found, and the father's refusal to consent to the adoption would require dismissal of the petition.

However, the statutory changes, particularly to subsection (1), are crucial to the present case. The former statutory standard, which required not only a failure or refusal to perform parental duties but also, conjunctively, a settled purpose of relinquishing all parental claim, has now been changed to the alternative, although the operative words describing the actual conduct involved remain as before. See the excellent article in XLII Pa. Bar Ass'n. Quarterly 499 (1971), by President Judge Edwin H. Satterthwaite of the Court of Common Pleas of Bucks County. This change was not made because of any lack of respect for the parent-child relationship, which all agree should be severed only for the strongest of reasons. It does recognize, however, that the relationship involves not one but two human beings and that, if there is to be a continuation of it, it should not be capable of use by one to the detriment of the other.

The difficulties which existed with the concept of abandonment under the Act of April 4, 1925, created the need for the changes made in the Act of July 24, 1970. It is a remedial statute, and should be construed and applied to effectuate its overall purpose. It frees us to consider the desirability and fairness of maintaining

the parent-child relationship from the standpoint of the child as well as the parent. Indeed, it may be noted that subsection (2) of section 311 is new in the Act of 1970, and relates solely to the well-being of the child, as cause for involuntary termination. It has recently been ruled in Loar Adoption, 56 D. & C. 2d 618, 623 (C. P. Mercer, 1972), that under subsection (2) parental rights may be terminated entirely without regard to the usual concepts of willfulness or fault on the part of the parent, since those who cannot care for a child, as well as those who will not, are brought within its terms. With these rules in mind, we turn now to the evidence.

The testimony reveals that respondent and the child's mother lived together in Tampa, Florida, for some time before they were married. They were married on or about February 1, 1971. The child was born on February 4, 1971. Mr. and Mrs. Snively had also lived together in New York and Philadelphia, among other places. They stayed together for about six months after the marriage, while husband worked at times, changing jobs frequently, and also went to school. Husband and wife gradually drifted apart, and separated around September of 1971, when the wife went to live with a friend and took the child with her. Respondent left Tampa in November 1971, but saw the child occasionally as long as he was in Tampa. He went to Denver, Colorado, for a short time but returned to Tampa, Florida, in December. He testified that he knew the child was well cared for by his wife, and that at times she wanted support and at other times she did not. When respondent returned to Tampa in December, he saw his wife and child once, but never asked to take the child on visits because his wife opposed this.

Respondent left Tampa again in December and

went to Milwaukee, Wisconsin, with the financial assistance of his mother. He stayed there about five months. The child's mother was murdered on January 23, 1972. When informed of this, respondent inquired of his mother about the baby, but probably found out from husband-petitioner herein, his father-in-law, that the child was in a foster home. A custody hearing was held in Florida, in which custody of the child was awarded to the present petitioners. However, respondent did not attend, although he admitted that he could have done so; rather, he asked his mother to go and ask for custody to be given to respondent, as he could have taken care of the child by paying baby-sitters in the boarding house in which he was living, since 16 or 18 other persons also lived there.

Respondent had no further contact or concern with the child until July of 1972. Her birthday passed without any recognition on his part. He explained that he did not know the Kramers' address at the time, but tried once to get it from telephone information. Respondent headed north from Tampa, to which he had returned in May, some time in July 1972, with his destination as New York. He stopped to see the child twice at the Kramer residence, and succeeded in seeing her once, on July 12th, since she was asleep on the other occasion. Thereafter, he went to upstate New York and stayed with another man and woman in a rural area, before going back to Tampa by air in August. He did not stop to see the child at that time, because he was travelling by air and the flight did not stop in Philadelphia.

We accept respondent's testimony at its face value because even so it is wholly inadequate to show that he has performed, or even desired to perform, any parental duties as that concept must be understood.

"The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited": Smith Adoption Case, 412 Pa. 501, 505 (1963). What proper parental duties are might vary considerably with existing circumstances; but they certainly include, as a minimum, the provision of care and affection, visiting, communication, and any other thing required by a young child to preserve and protect its physical and emotional needs. That others are carrying this burden, to a greater or lesser extent, can be no justification for default by the parent. Respondent obviously was, first and foremost, concerned with his own needs, desires and pursuits and, as far as the record shows, never concerned himself with his child except when it suited his own convenience or plans. We could not find that his conduct clearly showed an intent to abandon, for his last visit to the Kramer home was less than three months prior to the filing of the petition for adoption; but we have no difficulty in concluding that respondent has failed and refused to perform parental duties, and, for his part, has entirely neglected to provide essential parental care.

We have been aided in our conclusion by noting that other judicial decisions which have considered this problem are in agreement with us. The excellent opinions in Adoption of J. R. F., 27 Somerset 298 (1972); Owen Adoption, 51 D. & C. 2d 761 (C. P. Mercer, 1971), and Casteel Adoption, 55 D. & C. 2d 307 (C. P. Fayette, 1972), have aided us in reaching our conclusion that the provisions of the Act of July 24, 1970, under consideration represent a change in substantive law in this area. Consequently, we enter the following

## DECREE

And now, July 24, 1973, upon consideration of the petition for involuntary termination of parental rights, and after hearing, and being satisfied that respondent, Kenneth Kevin Snively, has forfeited his parental rights, it is ordered and decreed that the parental rights of Kenneth Kevin Snively with respect to his daughter, Catherine Alice Snively, be and are terminated; custody of Catherine Alice Snively is awarded to Charles Albert Kramer, Jr., and Georgene Alice Kramer, his wife, petitioners; and, further proceedings with respect to the adoption of said child may be had without further or additional consent or notice to Kenneth Kevin Snively.